**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|                                                |     |                      |
|------------------------------------------------|-----|----------------------|
| E.I. DU PONT DE NEMOURS & COMPANY,             | )   |                      |
|                                                | )   | 06 Civ. 4682 (RCC)   |
| Plaintiff,                                     | )   |                      |
|                                                | )   |                      |
| - against -                                    | )   | MEMORANDUM &         |
|                                                | )   | ORDER                |
| INVISTA B.V. and INVISTA S.À.R.L.,             | )   |                      |
|                                                | )   |                      |
| Defendants.                                    | )   |                      |

**RICHARD CONWAY CASEY, United States District Judge:**

Plaintiff E.I. DuPont de Nemours and Company ("DuPont") brings this motion for preliminary and permanent injunction to prevent Defendants INVISTA B.V. and INVISTA S.À.R.L. ("INVISTA") from acquiring William Barnet and Son, LLC ("Barnet").[1] DuPont alleges that the acquisition would violate a November 16, 2003 Purchase Agreement between DuPont and INVISTA's predecessors,[2] ("Purchase Agreement") pursuant to which INVISTA acquired DuPont's textiles and interiors business and concomitantly agreed to a non-compete provision preventing INVISTA from entering into certain parts of the nylon engineering resin business. Because DuPont has failed to demonstrate that it will be substantially likely to succeed in showing that Barnet's infringing practices constitute more than 10% of Barnet's business, and because it has actually failed to make such a showing, the motion for preliminary and permanent injunction is **DENIED**.

---

[1] At oral argument held on August 10, 2006, the parties confirmed their willingness to have the Court rule on both the motions for preliminary and permanent injunctions.

[2] By Novation Agreement dated May 3, 2004, Invista B. V. was substituted for KED Fiber Ltd. and KED Fiber, LLC. as the Buyer.

I.  **BACKGROUND**

   A.  **Nylon Basics**

In 1935, DuPont introduced Nylon,[3] a synthetic polymer which proved to have copious industry and consumer uses. The parties describe two hemispheres in the world of Nylon: Nylon fibers, intended for use in textiles and fabrics, and Nylon polymers or resins, intended for use in various products and forms referred to below as Engineering Resin Applications. "Fibers," for the purposes of this case, are "manufactured fibers including staple fibers and continuous filaments but exclude Monofilament Products." (See Purchase Agreement § 1.1.) "Engineering Resins" are "resins, polymers or copolymers with or without additives, modifiers and/or fillers, with tailored physical properties such as toughness, stiffness, impact, crystallization rate, mold release, light, oxidative and heat stabilization, fatigue resistance and/or flame retardancy properties, and the like, for Engineering Resin Applications." (Id.) "Engineering Resin Applications" are defined as "finished articles, other than Fibers, filaments, and films, and production of such finished articles in many forms and shapes (including tubes and sheets), formed from polymers by many specific techniques such as injection molding, blow molding, roto-molding, extrusion, casting, etc., where such articles have tailored physical properties . . . . which provide specific property benefits . . . ." (Id.)

The process of manufacturing Nylon Fiber creates nylon fiber waste. The waste, however, is bought, sold, and recycled. "Recycled Nylon," for the purposes of this case, means "Nylon reclaimed from: (i) Nylon which has been recycled by a physical process (meaning the sorting,

---

[3] In the Purchase Agreement, all capitalized terms are defined in section 1.1. Unless otherwise indicated, capitalization in the text of the opinion indicates the terms' meaning as defined in the Purchase Agreement.

2

combining, mixing, feeding, remelting, density classifying, or otherwise physically preparing the Nylon); or (ii) Nylon which has been reclaimed or recycled by a process (e.g., solutioning by the dissolving of Nylon into solution, the filtration of insolubles from the solution, and the precipitation of the Nylon from the solution) other than chemical recycle to monomers or oligiomers, which monomers can be used for repolymerization to first quality Nylon." (See id.)

To recycle Nylon Fiber waste by physical process, processors sort, remelt, densify and pelletize the waste. Recycled Nylon can be used for Fibers or for Engineering Resins. First, the processor will sort waste based on the various forms in which waste may be presented (such as fabric on rolls, fiber in bales, or lump and chunk). The waste is then conveyed into a metal detector to remove any metals. The material is then heated and compacted and fed into an extruder, often via a screw, where the material continues to be heated and compacted until it melts. That material can next be passed through a vacuum to remove volatiles including moisture. It is then fed through a melt filter, a screening device that removes contaminants and impurities from the melted plastic stream. It is then pushed through a die with holes to generate continuous strands of nylon material as the liquid solidifies on contact with the cooler air. The strands are then cooled and quenched in water, cut in a granulator, weighed, and dried. Small pellets are removed. The end product is recycled nylon.

The process for creating Fibers is quite discriminating; it includes greater selectivity of feedstock type, color, and purity, and requires much smaller holes in the melt filter which allow for fewer contaminants. The procedure for creating pellets for use in engineering resins is comparatively forgiving because engineering resins can tolerate more contaminants and variation in the composition of the waste and the resulting resin.

Depending on the type and quality of the waste, and the type of processing, processors can then sell the product to spinners, who will use the Recycled Nylon fibers in textiles; to molders, who in some cases will use the recycled nylon directly in consumer plastic products; or to compounders, who introduce certain additives to the recycled resin and then send it to molders.

### B. Relationship Between the Parties

Approximately 70 years after Nylon was invented, on November 16, 2003, pursuant to the Purchase Agreement, DuPont divested its textiles and interior business. The divestiture split DuPont's Nylon business: the Nylon Fibers market went to INVISTA (for use in the textiles and interiors business) and Engineering Resins stayed with DuPont. The Parties subsequently amended the agreement on December 23, 2003, April 7, 2004, and April 24, 2004. Prior to the Purchase Agreement, the parties entered into Patent and Technical Information Agreement ("PTIA"). The PTIA sets forth the business fields in which each respective party was permitted to use specific patents and technical information upon the divestment of DuPont's textiles and interiors business. Also related to the Purchase Agreement were two supply agreements intended "to assure DuPont a steady supply of the raw materials it needed to make Nylon: (1) nylon fiber waste for DuPont's recycling operation, and (2) nylon intermediaries, for the polymerization of new, or virgin, Nylon." (Pl.'s Br. 4.)

"Critical" to the success of the divestiture (DuPont Reply at 1) and central to the Purchase Agreement, is section 5.9, which contains the non-compete provisions at issue in this motion. It states, in pertinent part, that until April 30, 2009, INVISTA shall not:

> (i) manufacture, distribute, resell, or sell any Engineering Resin comprised of, containing, or made from Nylon, [with certain stated exceptions] . . . ;
> (ii) distribute, resell or sell any Nylon (other than Post-Industrial

4

> Nylon Fiber Waste or Recycled Nylon) to any third party for use in Engineering Resin Applications . . . (For the purposes of this subparagraph (ii) only, "selling" . . . shall mean knowingly selling . . . directly or indirectly (such as through a distributor who is known to sell into this market));
>
> . . .
>
> (iv) subject to Section 5.9(d), acquire any equity or debt interest in any Person that is engaged in any activities prohibited in by clause (i), (ii), or (iii) above (or the Assets of any such person to the extent associated with any such activities) . . . ; provided, however, that nothing herein shall restrict Buyer from supplying Nylon to DuPont or its affiliates.

(Purchase Agreement § 5.9(b)(i)-(b)(iv).) Section 5.9(d) states that nothing in Section 5.9(b) shall prevent INVISTA or its affiliates from acquiring:

> any Person or the assets thereof, if less than ten percent (10%) of the gross revenues, assets, and income of such Person or assets (based on such Person's latest annual audited consolidated financial statements) are related to or were derived from any of the prohibited actions referred to in Section 5.9(b); provided, that the Buyer and its Affiliates divest themselves . . . within two (2) years of such acquisition, of all of the assets or operations so acquired that are engaged in any of the activities prohibited in Section 5.9(b).

(Id. § 5.9(d).)

According to DuPont, since approximately Spring 2005, INVISTA has been seeking out opportunities to acquire nylon recycling operations, and sometime thereafter, it gained interest in Barnet. Barnet is a nylon processor and creates recycled nylon primarily for the fibers business (in Nylon and other material), but also for yarns and polymers. On the fiber side, for example, Barnet "[b]uys substandard fibers and yarns to recycle and convert into usable fibers" while on the polymers side it "sorts, melts, extrudes, and chops material to produce polymer chips . . . of a technically superior grade with high-end uses." (Dwyer Aff. Ex. 11 at 6.) The process that Barnet uses for recycling nylon is essentially the same as the physical process described above. Barnet has

stated that it sells its recycled nylon to compounders, who then modify the resins, and then sell the product to molders ready for use in Engineering Resin Applications. (See Hall Dep. 90:7-12.) Barnet does not generally sell to molders directly. (Id. 166:17-18.) INVISTA concedes that, rarely, Barnet will introduce (compound) additives in the recycling process which (indisputably) creates an Engineering Resin. (See INVISTA Opp'n at 9; Hall Dep 41:8-10.) Barnet estimates this makes up about 0.18% of its consolidated gross revenue, 0.19% of its consolidated income and 1.00% of its assets. (INVISTA Opp'n at 9.)

DuPont filed the present complaint on June 19, 2006, along with requests for expedited discovery and an order temporarily restraining INVISTA from effectuating the acquisition of Barnet. Shortly thereafter, the parties entered into a protective order, the parties agreed upon an expedited discovery schedule, and INVISTA agreed to delay the acquisition of Barnet until after oral argument scheduled for August 10, 2006.

DuPont argues the acquisition of Barnet by INVISTA would violate Purchase Agreement section 5.9(b)(iv). The central thrust of DuPont's argument is that the Recycled Nylon that Barnet produces or manufactures is an Engineering Resin and as such is in violation of section 5.9(b)(i). INVISTA counters that Recycled Nylon is not a synonym for Engineering Resin, even when it is eventually sold to compounders for use in Engineering Resin Applications. It claims DuPont's reading runs afoul of the Purchase Agreement and the PTIA, both by subsuming the definition of Recycled Nylon in the former and by directly contradicting the narrower definition of Engineering Resin provided by the latter. Specifically, INVISTA argues that an Engineering Resin, as defined in the PTIA, is either "Modified" or "Unmodified" but could never be the product of a normal Nylon

6

recycling process.[4]  INVISTA further argues that section 5.9(b)(ii) provides an express exemption for Recycled Nylon such that Barnet's operations are contemplated and allowed under the Purchase Agreement.

## II. DISCUSSION

### A. Standard for Preliminary and Permanent Injunction

It is well established in this Circuit that preliminary injunctive relief is appropriate when a plaintiff establishes "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in [plaintiff's] favor." Wisdom Import Sales Co. L.L.C. v. Labatt Brewing Co. Ltd., 339 F.3d 101, 108 (2d Cir. 2003) (internal quotation marks omitted).  The standard for a permanent injunction is

---

[4] The PTIA provides that DuPont would retain exclusive use of "all aspects of making, having made, licensing to Third Parties, selling, offering to sell and importing . . . (1) Nylon Modified Engineering Resins (2) Nylon Unmodified Engineering Resins . . . [and] (3) Nylon (other than Recycled Nylon and Post-Industrial Nylon Fiber Waste) for use in an Engineering Resin Application . . . ." (See PTIA at S6-12.) "Modified Engineering Resin," is defined in the PTIA as: "resins, polymers or copolymers where additives, modifiers and/or fillers have been compounded into resins, polymers, and copolymers, to tailor physical properties . . . for Engineering Resin Applications." (Id. at S4-15.) Modified Engineering Resin is neither defined, nor to the Court's knowledge, included in the Purchase Agreement. "Unmodified Engineering Resin," is defined in the PTIA as "resins, polymers or copolymers with or without additives or modifiers produced directly from a polymerization process (e.g., batch and/or continuous polymerization) tailored to modify physical properties . . . for Engineering Resin Applications; but where additives, modifiers and/or fillers have not been compounded into the resin, polymer, or copolymer." (See id. at S4-10.) Unmodified Engineering Resin is neither defined, nor to the Court's knowledge, included in the Purchase Agreement.  According to INVISTA, there are only two ways to make an Engineering Resin (as defined in both the PTIA and the Purchase Agreement): (1) By compounding additives, modifiers or fillers into Nylon, which would result in a "Modified Engineering Resin"; or (2) through polymerization, with or without additives, which would result in "Unmodified Engineering Resin."  INVISTA argues that, under the PTIA, the parties understood that all Engineering Resins are either "Modified" or "Unmodified."

7

essentially the same as the standard for a preliminary injunction with the exception that the plaintiff must show actual success on the merits. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 (1987). The usual injunctive relief analysis may be inverted where, as here, the existence of irreparable harm turns on the Court's determination of whether a contract has been breached vel non. Wisdom Import Sales, 339 F.3d at 108. The Court finds that DuPont has failed to show that INVISTA's acquisition of Barnet would violate the terms of the Purchase Agreement and thus cannot show either a likelihood of success, or actual success, on the merits. Because DuPont cannot show a breach of the Purchase Agreement, it cannot demonstrate irreparable injury or hardship warranting the requested equitable relief.

   1.   **Success on the Merits**

The parties do not dispute that the Purchase Agreement is governed by New York law. Nor does INVISTA claim the non-compete provision is unenforceable under New York law conceding the provision is reasonable in scope and duration, necessary to protect a legitimate business interest, and negotiated by sophisticated parties. Instead, the parties' core dispute involves their disparate interpretations of sections 5.9(b)(i), 5.9(b)(ii), and 5.9(d)(i) of the Purchase Agreement. To resolve this dispute the Court is called upon to interpret and define terms and clauses in the Purchase Agreement.

Under New York law, it is the Court's role to "discern the intent of the parties to the extent their intent is evidenced by their written agreement." Int'l Klafter Co. v. Cont'l Cas. Co., 869 F.2d 96, 99 (2d Cir. 1989). When a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to determine without resort to extrinsic evidence. LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005); Waldman ex rel.

Elliott Waldman Pension Trust v. Riedinger, 423 F.3d 145, 149 (2d Cir. 2005) ("'[I]f a contract is unambiguous on its face, the parties' rights under such a contract should be determined solely by the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.'" (quoting County of Suffolk v. Alcorn, 266 F.3d 131, 138 (2d Cir.2001)). There is little disagreement on this point; while the parties fundamentally disagree on the obligations contained in the Purchase Agreement, they both argue (without irony) that the Court is restricted to the plain language of the Purchase Agreement because it is unambiguous. The Court finds that the Purchase Agreement provisions in dispute are in fact unambiguous and thus will look to the plain meaning of terms therein without resort to extrinsic evidence.

### a. Section 5.9(b)(i)

Section 5.9(b)(i) prohibits INVISTA from manufacturing, distributing, reselling, or selling any Nylon Engineering Resins, with some specific exceptions. Engineering Resins are defined in the Purchase Agreement as "resins, polymers or copolymers, with or without additives, modifiers and/or fillers, with tailored physical properties . . . for Engineering Resin Applications." (Purchase Agreement § 1.1.) Based on this unambiguous definition, the Court concludes that the touchstone for determining whether Barnet makes Engineering Resins is whether the product of its recycling process is a resin that possesses the kind of "tailored physical properties" required for Engineering Resin Applications.

The parties resort to far more elaborate explanations. DuPont goes to considerable lengths to characterize the Barnet recycling process as a manufacturing process, and exerts further effort trying to characterize all Recycled Nylon to be used in Engineering Resin Applications as an

9

Engineering Resin. This argument is at once unnecessary and unavailing.

It is unnecessary because, even if Barnet's recycling process does not constitute "manufacturing," if DuPont is correct that all Recycled Nylon to be used in Engineering Resin Applications is an Engineering Resin, then Barnet would violate section 5.9(b)(i) when it "sells" Engineering Resins. Thus the "manufacturing" versus "processing" debate is immaterial.

The argument is also unavailing because DuPont attempts to give Engineering Resin too broad a definition; it simply cannot be that all Recycled Nylon polymers are Engineering Resins. The definition of Recycled Nylon, at least as it pertains to the present dispute, involves Nylon which has been recycled by a physical process (the method Barnet uses); it says nothing of the tailored physical properties that define an Engineering Resin. To be sure, Recycled Nylon is often made such that its intended and eventual use will be for an Engineering Resin Application, but absent tailored physical properties, this does not an Engineering Resin make. The Court finds that a pellet of Recycled Nylon for use in non-Fiber applications usually does not constitute an Engineering Resin—it constitutes Recycled Nylon.

INVISTA, for its part, improperly relies on the PTIA in its effort to characterize Engineering Resins as limited only to those resins, polymers, or copolymers with tailored physical properties that are the result of either a compounding process ("Modified Engineering Resins") or a polymerization process ("Unmodified Engineering Resins" that lack additives or fillers). The thrust of INVISTA's argument is that Recycled Nylon that has not been compounded or polymerized is never an Engineering Resin. In support of importing the definition in the PTIA, INVISTA cites <u>Commander Oil Corp. v. Advance Food Service Equipment</u>, 991 F.2d 49, 52-53 (2d Cir. 1993), wherein the Second Circuit held that two related and interdependent contracts dealing with the same business

transaction should be treated as one. Assuming <u>arguendo</u> that the PTIA and the Purchase Agreement share such a relationship, <u>Commander</u> does not aide INVISTA. The Court simply cannot and will not incorporate the two terms "Modified Engineering Resin" and "Unmodified Engineering Resin" into the Purchase Agreement's definition of Engineering Resin where (1) the term Engineering Resin is clearly defined (in both contracts) and has independent meaning; (2) the PTIA itself does not anywhere state that all Engineering Resins are either Modified or Unmodified;[5] and (3) the two terms never appear in the Purchase Agreement. Indeed, so much of the PTIA language was imported verbatim into the Purchase Agreement that the absence of the Modified and Unmodified definitions in the Purchase Agreement appears intentional. Thus the Court must infer that Engineering Resin, where the term is used in the Purchase Agreement, is to be given the meaning defined in that agreement.

While DuPont argues that all Recycled Nylon is an Engineering Resin, and INVISTA argues the exact opposite, the Court finds that some Recycled Nylon can constitute an Engineering Resin. This is because the pellet created in the Nylon recycling process is determined by the raw material (waste) selected at the beginning of that process, and it is possible (albeit infrequent) that the end product might have the specific physical properties to constitute an Engineering Resin. As noted, DuPont has offered that it sometimes recycles nylon and sells it as an Engineering Resin, without further modification with additives.

Thus, to the question, "When is Recycled Nylon an Engineering Resin?" the Court answers,

---

[5] A literal read of INVISTA's PTIA-based argument suggests that Modified and Unmodified Engineering Resins are the only Engineering Resins covered under the PTIA, not that there are only two ways to make and Engineering Resin. Indeed, it is quite possible that these two types of Engineering Resin are the only kinds of Engineering Resin that are subject to patent.

11

"When it has the tailored physical characteristics to be sold as one." Indeed, there seems to exist a begrudging (and perhaps unwitting) consensus among the parties' experts that Recycled Nylon can, but usually does not, have the tailored physical properties of an Engineering Resin. (Compare DuPont's Reply at 4 ("[R]ecycled Nylon can, in fact, be used directly in Engineering Resin Applications")(emphasis added); Zenel Supplemental Aff. ¶ 5 ("Recycled Nylon can be an Engineering Resin, depending on how its processed") (emphasis added); id. ¶ 7 (noting only three recycled nylons that DuPont sells directly to manufacturers of Engineering Resin Applications); with Hall Aff. ¶¶ 9-10 (noting that Nylon "typically" requires subsequent manufacturing processes to achieve the specific characteristics of an Engineering Resin, and that Recycled Nylon in its raw pellet form is "generally unsuitable for molding.")

In sum, the relevant inquiry for section 5.9(b)(i) purposes is whether the final product of Barnet's nylon recycling operation has specific properties (e.g., toughness or flame retardancy) that would render it an Engineering Resin. INVISTA admits that Barnet produces a nominal amount of Engineering Resins on a tolling basis (where it does not own the raw material) by introducing additives to the recycling process. (See INVISTA Opp. at 9; Hall Dep. 56:22-57:4.) There is no dispute that when additives are added to Nylon in order to foster specific physical properties the result is an Engineering Resin. For this reason, Barnet is in violation of section 5.9(b)(i).

But DuPont can show no other violation of section 5.9(b)(i). The Court's finding that some Recycled Nylon can in limited circumstances constitute an Engineering Resin does not aid DuPont's cause, for DuPont cannot point to any evidence that Barnet actually sells Recycled Nylon directly (that is, as an Engineering Resin) to molders or other manufacturers of Engineering Resin Applications. Indeed, DuPont's lengthy compilation of Barnet's business activity (see, e.g., Exs.

11, 15 & 16) contains few, if any, references to the production of Engineering Resins (as opposed to selling recycled polymers into the Engineering Resins market). The only possible evidence that Barnet may sell (uncompounded, unmodified) Recycled Nylon pellets with the requisite tailored physical properties for direct use in an Engineering Resin Application is a document titled "Volume Sold into Engineering Resin Application[s]," which contains an asterisk next to two customer names and states: "These 2 customers purchased pellets that may have been used directly to produce cable ties, but Barnet has no confirmation. It may have been modified by these customers prior to use to produce a finished article." This evidence is simply insufficient to advance DuPont's case—it is both conditional and unconfirmed even by the party that generated it.

### b. Section 5.9(b)(ii)

Section 5.9(b)(ii), via Section 5.9(b)(iv), prohibits INVISTA from purchasing Barnet if Barnet distributes, sells, or resells any Nylon that will be used in an Engineering Resin Application, with two exemptions. Unlike 5.9(b)(i), this section deals not with Engineering Resins but with any Nylon intended for use in an Engineering Resin Application. As a result, even Nylon that is not an Engineering Resin comes under 5.9(b)(ii)'s purview if it is knowingly sold for use in Engineering Resin Applications, whether "directly or indirectly."

However, section 5.9(b)(ii) exempts from its prohibition Post-Industrial Nylon Fiber Waste and Recycled Nylon. While INVISTA advances several seemingly meritorious reasons for the exemptions (see INVISTA's Opp. at 6-7), the Court need not turn to those explanations to find that Barnet's recycling process creates Recycled Nylon, and that Recycled Nylon is exempted by section

13

5.9(b)(ii).[6] To the extent DuPont makes any real attempt to demonstrate that the Recycled Nylon exception in 5.9(b)(ii) does not mean exactly what it says, the Court rejects the argument.

### c. Section 5.9(d)

DuPont has shown that Barnet violates section 5.9(b)(i) when it makes Engineering Resins by the introduction of additives during the recycling process to create resins with tailored physical properties. DuPont has failed to show that Barnet participates in any other infringing activity. Notwithstanding the violation of 5.9(b)(i), however, INVISTA's acquisition of Barnet is permitted under section 5.9(d) of the Purchase Agreement if less than 10% of Barnet's gross revenues, assets, and income (based on Barnet's 2005 audited consolidated financial statements) are related to or derived from the conduct prohibited under 5.9(b).[7]

Barnet estimates, and DuPont does not challenge, that its compounding activities make up about 0.18% of its consolidated gross revenue, 0.19% of its consolidated income and 1% of its assets. (INVISTA Opp. at 9.) This is clearly less than 10%. Based on Barnet's 2005 consolidated financial statements, DuPont cannot put forth any credible evidence of other infringing conduct and thus fails to meet its burden under 5.9(d).[8]

---

[6] It is worth noting that nothing in the exemptions in section 5.9(b)(ii) would allow INVISTA (or Barnet once acquired) to take Post-Industrial Nylon Fiber Waste or Recycled Nylon and manufacture Engineering Resins; 5.9(b)(ii), however, allows them to be sold to someone who will turn it into an Engineering Resin for use in Engineering Resin Applications.

[7] The Court rejects the argument that it should focus on Barnet Polymers, LLC, a subsidiary of Barnet, in the calculation it must perform under section 5.9(d). INVISTA seeks to buy Barnet in its entirety. Further, that 5.9(b) calls for analysis under the latest annual consolidated financial activities demonstrates that the section anticipated purchase of companies with multiple subsidiaries.

[8] While the Court finds that trading of Engineering Resins would qualify under section 5.9(b)(i)'s prohibition against distributing, selling, or reselling Engineering Resins, DuPont has

14

thus fails to meet its burden under 5.9(d).[8]

Because DuPont has failed to show that over 10% of Barnet's gross revenues, assets, and income yields from infringing activity, DuPont has failed to show a breach of the non-compete provisions of the Purchase Agreement and thus cannot show any irreparable injury or hardship.

## III. CONCLUSION

For the foregoing reasons, DuPont's motion for preliminary and permanent injunction is **DENIED**.

**So Ordered:** New York, New York
August 18, 2006

Richard Conway Casey U.S.D.J.

---

[8] While the Court finds that trading of Engineering Resins would qualify under section 5.9(b)(i)'s prohibition against distributing, selling, or reselling Engineering Resins, DuPont has produced no evidence that Barnet actually does trade Engineering Resins as the Court has interpreted the term.

15